## Commonwealth v. Page

*J. H. Maurer*, district attorney, for Commonwealth.
*Furia & DiCintio*, for defendant.

GUERIN, J., August 13, 1948.—The sole question involved in this motion for a new trial is the sufficiency of the Commonwealth's evidence to sustain the conviction. Defendant waived a jury trial. At the conclusion of the Commonwealth's case, defendant rested, and the court found defendant guilty of manslaughter.

Defendant is a sailor in the United States Navy, attached to the U. S. S. Spokane, berthed in the Brooklyn Navy Yard. On July 2, 1948, he and another sailor, Gene C. Harris, left the ship on liberty at 4:30 p.m. They procured defendant's automobile, a four-door 1941 Pontiac sedan, and drove about New York for a short time, meeting another sailor and a girl companion, whom they drove uptown. After leaving them, defendant and Harris "had about four shots of whisky", sometime between 9 and 11 p.m. They rejoined their sailor friend and his girl companion, drove them to her home in the Bronx, and remained there until sometime between 2 a.m. and 3 a.m. Defendant and Harris then drove the third sailor to the Holland Tunnel, where they left him, and proceeded to drive to Philadelphia. Harris fell asleep on the rear seat, and never

woke up until the car hit the telegraph pole on the Roosevelt Boulevard at 6:45 a.m. (D. S. T.), that morning, July 3rd.

Park Guard Raymond P. Vecchione testified that he was on duty on the Roosevelt Boulevard at Southampton Road, when he observed what later proved to be defendant's car up against a post on the lawn on the southwest side of the intersection, about two feet from the curb on Southampton Road, and about 15 feet from the curb of Roosevelt Boulevard. He proceeded toward Philadelphia in search of the occupant of the car and had gone about a mile when he observed a tow truck traveling from Philadelphia toward the scene of the accident. Upon stopping the truck, he found defendant in it, and Harris was following in a car which was giving him a ride. Defendant admitted he was the driver of the Pontiac, whereupon the officer entered the truck and proceeded to Southampton Road, where his superiors assumed charge. Page was taken to the hospital for treatment of his eye, injured by a piece of glass, and was later removed to the guard house, together with Harris. On their way back in the tow truck, Page told the officer that he and Harris had been told by a couple of people that they hit somebody up the road, but they said they thought the people were kidding.

Park Guard detective Richard Toppi testified that as the result of a report, he and Sergeant Grace went to the Byberry Hospital grounds, on the Roosevelt Boulevard, on the Philadelphia side of the county line. There, they found the deceased on the lawn on what was the driver's right, looking toward Philadelphia, lying about six feet beyond the curb line. This point was about four fifths of a mile north (or toward New York) of the point where defendant's car crashed against the pole. In picking up the body they found pieces of glass and a piece of metal. One piece of glass,

generally triangular in shape, about three inches across the base, and about four inches in altitude, was enveloped in deceased's clothing and fell out when the body was removed. The glass was fitted by the witness to a broken section of the window of the right rear door of defendant's sedan, and the metal strip was applied to a missing section of the moulding at the bottom of the same window. Both the glass and metal strip were produced and offered in evidence by the Commonwealth.

On the right side of defendant's car, toward the rear of the right door, were heavy brush marks. On the grass plot where deceased's body was found were brush marks where the grass had been scarred into the dirt. These began at the point where a black smudge resembling shoe polish was on the vertical side of the curb, and went in a line from this mark to where the body was found, a distance of approximately 20 feet. The witness questioned defendant an hour and a half later and defendant told him he didn't know he had struck anyone, as he had been dozing at the wheel.

Dr. Charles J. Swalm, coroner's physician, stated that deceased died of multiple injuries. He sustained a fractured skull, subdural and subarachnoid hemorrhage, contusion of the brain, fracture of sternum, fractures of both legs, multiple fractures of the ribs, hemorrhages of both pleural cavities, lacerations of left femur and lower throat. There were contusions over the right shoulder, forearm and hand, and a sharp-edge laceration, 2½ inches long; large contusions of the back of the head and neck, down over the back.

Although our appellate courts have not been presented with this precise set of facts, viz., the criminal responsibility of the driver of an automobile who sleeps at the wheel, nevertheless they have clearly established the principles which govern the consideration of such a question.

In Commonwealth v. Aurick, 342 Pa. 282 (1941), the present chief justice said (p. 287):

"To make out a case of involuntary manslaughter, it must be proved that the death of a human being was caused by another's *unlawful act*. It is immaterial whether the unlawfulness of the act is *inherent* in its *very nature and purpose* or arises only from the *manner of performing* an act which *in its inception and aims* is *not* unlawful.

"The law nowhere countenances careless, negligent and reckless conduct when that conduct menaces the physical well-being of others. Such conduct is therefore unlawful. It may not be unlawful if it menaces only the well-being of the reckless individual himself. It becomes so when others are brought within its compass. In Bisson v. Kelly, 314 Pa. 99, 110, 170 A. 139, this court said: 'It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable. A normal human being is held to foresee those injuries which are the consequence of his acts of omission or commission which he, as a reasonable human being, should have foreseen.' "

At page 288 the opinion continues:

"In Com. v. Gable, 7 S. & R. 422, at 427, this court, in an opinion by Chief Justice Tilghman, said: 'Involuntary manslaughter is, where it plainly appears that neither death nor any great bodily harm was intended, but death is accidentally caused by some unlawful act, or an act not strictly unlawful in itself, but done in an unlawful manner and without due caution.' "

Continuing at page 290:

"On the other hand, the proof of negligence to support a charge of *involuntary manslaughter* need

*not* be proof of acts or omissions exhibiting *reckless, wicked and wanton* disregard of the safety of others. *Negligence of that high degree* will support a charge of *murder in the second degree,* as this court recognized in Commonwealth v. McLaughlin, 293 Pa. 218."

And at page 291:

"If the appellant in the instant case ran his car in a manner which was rash and reckless at the time and place in question, he was guilty of an unlawful. act, for he was doing something the law forbids."

In Commonwealth v. Dellcese, 155 Pa. Superior Ct. 120 (1944) it was said, at page 124:

"If, as here, the act in itself, the driving of the car is not unlawful, that is contrary to law, then to make the act criminal 'the negligence must be such a departure from what would be the conduct of an ordinary prudent or careful man under the same circumstances as to evidence a disregard of human life or an indifference to consequences'. 90 American State Reports 572, cited by the Supreme Court in Commonwealth v. Aurick, supra, pp. 288, 289. There must be an element of recklessness or rashness."

In Commonwealth v. Holman, 160 Pa. Superior Ct. 211 (1947) there was an appeal by defendant, an automobile driver, from a conviction of involuntary manslaughter before our late President Judge Finletter. In affirming the judgment of the lower court, the Superior Court said (p. 212):

"Involuntary manslaughter is committed where it appears that neither death nor any great bodily harm was intended, but death is accidentally caused by some unlawful act. Commonwealth v. Micuso, 273 Pa. 474, 117 A. 211. The essence of the crime of involuntary manslaughter is the death of a human being in consequence of an unlawful act. Commonwealth v. Stosny, 152 Pa. Superior Ct. 236, 31 A. 2d 582. It is immaterial whether the unlawful act was unlawful in its

inception or became unlawful after it was begun. Commonwealth v. Aurick, 342 Pa. 282, 19 A. 2d 920. When the act in itself is not unlawful, that is, contrary to law, then to make it criminal, negligence must be such a departure from what would be the conduct of an ordinary prudent man under the same circumstances as to evidence a disregard of human life or an indifference to consequences. Commonwealth v. Dellcese, 155 Pa. Superior Ct. 120, 38 A. 2d 494."

In State of Utah v. Olsen, 108 Utah 377, the Utah Supreme Court, on June 27, 1945, affirmed a conviction of involuntary manslaughter, where it appeared that defendant, a truck driver at an Army base was ordered to take her truck to a railroad station to pick up some soldiers. Just after leaving the base she became drowsy. She opened the windows for a breeze to combat the feeling, and drove on. She stopped for a semaphore light, a short distance from the scene of the accident, started up on the green light, and had just shifted to third gear when she fell asleep; the accident occurred shortly thereafter. Defendant had no recollection of the facts of the accident but it was not disputed that the truck went up over the right curb onto the sidewalk, went along the sidewalk for some distance, striking and killing a child playing on the sidewalk.

After reviewing cases of the courts of Michigan, Connecticut, Alabama, Washington, California, Vermont and Massachusetts, the opinion of the court, by Chief Justice Larson, reads, p. 380:

"The burden of the foregoing authorities is overwhelmingly that the fact of going asleep at the wheel of an automobile, without more, at least presents a question for the jury as to whether the driver was negligent. We think this a sound and salutary rule, for while one cannot be liable for what he does during the unconsciousness of sleep, he is responsible for allowing

himself to go to sleep—to get into a condition where the accident could happen without his being aware of it, or able to avoid it. Bushnell v. Bushnell, supra. We think the jury could find such conduct to be negligence manifesting a marked disregard for the safety of others on the highway. Were this not the rule, the negligent driver of an automobile would better sleep while driving and avoid criminal and civil responsibility . . . for his acts of negligence. The evidence presented an issue for the jury, and is sufficient to sustain their verdict."

Considering the kind of an instrumentality an automobile is, and the potential danger to life and limb it offers, it is obvious that its operator should at all times be in possession of his faculties. This defendant had been up and about at least since 4:30 the previous afternoon, when he received his liberty. With the familiarity we all enjoy of the routine of the armed services, it may be assumed that he had been without sleep for several hours before that. The evidence showed that he had *"about"* four Scotch whiskys seven or eight hours before the accident, and had been on a continuous tour of entertainment and/or driving for approximately 15 hours. He admitted that he had been "dozing" at the wheel. This would seem to be expressing his condition mildly. There is no doubt about the fact that his car struck the deceased, and it must have been a very forceful blow to have hurled his body a distance of over 20 feet and to have inflicted the injuries sustained. If such a collision failed to awaken him to a realization of its occurrence—and we are accepting his statement to the detective that he was unaware that he had struck anyone—he must have been in a complete stupor.

Persons under the tension of driving an automobile do not fall asleep without warning, or a consciousness that sleep is approaching. The fact of falling asleep

while driving is sufficient from which a jury (or a judge sitting as a jury) might infer that defendant had felt sleep coming on, but had continued to drive in spite of the warning of nature. His so doing was such a departure from what would be the conduct of an ordinary prudent man under the circumstances as to evidence a disregard of human life or an indifference to consequences.

The motion for a new trial is therefore overruled.